IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
COLUMBIA DIVISION

**Mike Anthony Lindsey,** )
)
     **Plaintiff,** )
)
vs. )   **Case No. 1:13-cv-0130**
)   **Senior Judge Nixon**
**Carolyn Colvin,** )   **Magistrate Judge Brown**
**Commissioner of Social Security** )
)
     **Defendant.**

**To: The Honorable John T. Nixon, Senior United States District Judge**

## Report and Recommendation

This action was brought under 42 U.S.C. §§ 405(g), 1383(c)(3) to obtain judicial review of the final decision of the Social Security Administration ("SSA") upon an unfavorable decision by the SSA Commissioner ("the Commissioner") regarding plaintiff's application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act and Title XVI of the Supplemental Social Security Income Act ("SSI"). 42 U.S.C. §§ 416(i), 423(d), 1382(c). For the reasons explained below, the undersigned **RECOMMENDS** that the plaintiff's motion for judgment on the administrative record be D**ENIED** and the ALJ's decision be **AFFIRMED**.

### I.    PROCEDURAL HISTORY

Mike Anthony Lindsey ("Plaintiff") filed for DIB under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 416 & 1382, on August 10, 2010. (Administrative Record ("AR."), Docket Entry ("Doc.") 12, p. 114-20) Plaintiff's request was initially denied on November 12, 2010 (AR., Doc. 12, pp. 61-64) and upon reconsideration on May 7, 2011. (AR at pp. 68-71) Subsequently, a hearing was conducted before an Administrative Law Judge ("ALJ"), Kerry Morgan, on March 26, 2012. (AR. at p. 13) The ALJ denied Plaintiff's application on May 23,

2012 (AR., Doc. 12, p. 10), and Plaintiff requested review of the ALJ's determination on July 23, 2012. (AR. at pp. 7) The SSI Appeals Council denied review of the ALJ determination on August 16, 2013 (AR. at pp. 1-3), rendering the ALJ's determination the final determination of the Commissioner.

Plaintiff brought this action in district court on October 16, 2013 seeking judicial review of the Commissioner's decision. (Doc. 1) The defendant filed answer and a copy of the administrative record on January 9, 2014. (Doc. 11, 12) Thereafter, Plaintiff moved for judgment on the administrative record on February 4, 2014 (Doc. 14), to which the defendant filed response on March 5, 2014. (Doc. 16) Plaintiff filed reply on July 25, 2013. (Doc. 17)

This matter is properly before the court.

## II.  THE RECORD BELOW

Plaintiff's medical record is scant. Between 2005 and 2012, Plaintiff was treated at the Family Health Group ("FHG") on approximately seventeen different occasions.[1] On August 5, 2005, Plaintiff presented to FHG complaining of neck and "lower left flank pain." (AR., Doc. 12, p. 198) Dr. Couch's physical exam of Plaintiff was unremarkable except for the pain produced by palpation of Plaintiff's lower back. It was noted that steroidal and non-steroidal therapies were ineffective, and Plaintiff remained on narcotics for pain relief. Plaintiff was scheduled for magnetic resonance imaging on August 8, 2005.[2] (AR. at p. 198)

In 2006, Plaintiff was seen by Dr. Couch for a bite on his left arm pit that produced a "red raised" bump. (AR. at p. 199) Despite several phone consultations between March of 2006 and

---

1.  Plaintiff's medical record reflects that he has been treated for depression, but he asserts no error in the ALJ's finding that Plaintiff's depression is not a severe impairment. (AR., Doc. 12, p. 13)

2.  Despite Dr. Couch's notation that Plaintiff received an MRI on his lower back in 2005, there is no indication in the record that an MRI was performed. (AR., Doc. 12, p. 189) Plaintiff's application for DIB states that he received an MRI in 2008 (AR., Doc. 12, p. 148), but he reported to the DDS examining physician in 2010 that the MRI was performed in 2007. (AR., Doc. 12, p. 201)

January of 2007, Plaintiff was not seen by Dr. Couch again until January 16, 2007 regarding "severe epigastric discomfort" after his insurance no longer covered Prilosec. (AR., Doc. 12, p. 197) Plaintiff's exam was unremarkable and he reported no back or neck pain. Plaintiff was given samples of Nexium and a prescription for Zantac. Plaintiff was seen by Dr. Couch again on May 10, 2007 when he reported that his prescription for Lexapro had run out and requested treatment for erectile dysfunction. Dr. Couch renewed Plaintiff's prescription for Lexapro and prescribed Levitra. (AR. at p. 196) The record reflects that Plaintiff was not examined or treated by Dr. Couch again until January 31, 2012. (AR. at pp. 37, 255)

On July 11, 2007, Plaintiff reported to Physician Assistant Pat McCarthy that he "overdid it over the [weekend]" and was suffering from back spasms.[3] (AR. at p. 195) Plaintiff also reported pressure in his right ear and Ms. McCarthy noted that Plaintiff's tympanic membrane was "obscured by [a] whitish disch[arge]" that was believed to be a "fungal infection." (AR. at p. 195) Ms. McCarthy prescribed an antibiotic to resolve Plaintiff's ear ailment and Prednisone—a corticosteroid—to treat Plaintiff's lower back sprain. Plaintiff returned to FHG two weeks later due to continued pain in his lower back and was given a prescription for Lodine XL 400 and told to follow up with FHG as needed.[4] (AR. at p. 194-95)

On November 1, 2007, Plaintiff consulted with Ms. McCarthy about signs of depression. Although the medical notes from this visit with FHG are undecipherable, it appears that Ms. McCarthy prescribed Cymbalta. (AR. at pp. 193-4) Plaintiff reported later that month, and again in December after completing "outpatient treatment for methamphetamine addiction," that Cymbalta was "working well." (AR. at p. 193) Plaintiff was not seen at FHG again until April

---

3. Ms. McCarthy's clinical notes and impressions are not co-signed by any of the six physicians practicing at FHG. (AR., Doc. 12, pp. 186-95)

4. Lodine is a non-steroidal anti-inflammatory drug used to treat joint pain. *See* http://www.drugs.com/imprints/lodine-xl-400-2527.html.

3

of 2008 when he reported nausea and high blood pressure. Plaintiff was seen again on May 9, 2008 in follow up to an emergency room visit the prior day. (AR., Doc. 12, p. 191) According to Ms. McCarthy's treatment notes, Plaintiff reported pain in his left neck. Ms. McCarthy noted some tenderness in Plaintiff's neck but did not find any swelling or erythema during her exam. Plaintiff was prescribed Flexeril and Naprosyn and told to perform neck stretches 2 or 3 times a day. (AR. at p. 191) Plaintiff was seen again at FHG in November of 2008 to monitor his high cholesterol. (AR. at p. 190)

On April 8, 2009, Plaintiff reported back pain emanating from his lower back into his buttocks and legs. According to Plaintiff, he aggravated his back the prior week "while carrying his 30lb. grandbaby," and the pain had steadily worsened in the subsequent week. (AR. at p. 189) Ms. McCarthy noted some degenerative changes in x-rays and that Plaintiff's back, buttocks, and legs were tender to palpation, wrote Plaintiff a work excuse, and prescribed Percocet and Celebrex for pain.[5] Plaintiff reported little improvement on May 15, 2009 at a follow up appointment. Ms. McCarthy noted a past MRI showing "bulging discs in [Plaintiff's] back at L4 L5" and again prescribed Percocet for pain, but informed Plaintiff that "if this starts happening on a regular basis" she would refer him to an orthopedic doctor rather than "continue giving [Plaintiff] Percocet every couple of [months]."[6] (AR. at p. 189)

On May 26, 2009, Plaintiff was discharged from his job as a phosphoric acid operator after a second drug test showing that Plaintiff was a methamphetamine user. (AR. at pp. 31, 34) Plaintiff complained to FHG in July that he was no longer employed and lacked insurance, and, as a result, he could not afford Nexium and Cymbalta and requested alternatives to those

---

5. The record does not contain x-ray films or an impression of those films other than Ms. McCarthy's observations, which are not co-signed by a physician.

6. As noted by the ALJ, Plaintiff reported to State Agency examining psychologist, Elena Bloodgood, Psy. D., that he had never taken illicit drugs in the past and that he had been discharged due to his failure to follow orders. (AR., Doc. 12, pp. 19, 224-25)

medications. Ms. McCarthy gave Plaintiff samples of both drugs and agreed to help Plaintiff file for financial assistance with the drug companies. (AR. at p. 188) Ms. McCarthy resubmitted the financial assistance paperwork to Ely Lilly and GlaxoSmithKline in October. (AR. at p. 186)

Plaintiff was not seen again until January 31, 2012 when Dr. Couch completed a medical source statement regarding Plaintiff's degenerative disc disease ("DDD") and back pain. (AR., at p. 255) According to Dr. Couch, Plaintiff suffers from DDD in his neck and severe DDD of the lower spine. Plaintiff reported having a vertebral fusion in his neck in the "late 90's," an MRI shows a bulging disc at L4 and L5, and x-rays show further subsequent degenerative changes. Dr. Couch opined that Plaintiff can lift and carry 10 pounds occasionally but never more than that. Plaintiff can sit for up to one hour at a time but can only stand for 20 minutes and walk for 10 minutes before needing to rest. All told, Plaintiff can sit for 2 hours in an 8 hour day, stand for 45 minutes in an 8 hour day, and walk for 1 hour in an 8 hour day. According to Dr. Couch, Plaintiff must have the ability to "get up and move regularly back and forth to do any meaningful work." (AR. at pp. 246-53)

Plaintiff cannot perform activities such as shopping unaided or walk a block at a reasonable pace on rough or uneven surfaces, but he can travel without a companion, ambulate without assistance, use public transportation, climb steps with the use of a handrail, prepare meals and feed himself, care for his personal hygiene, and sort paper. Plaintiff's DDD imposes postural and environmental limitations on him that prevent him from climbing ladders or scaffolding, balancing, stooping, kneeling, crouching, or crawling. He may frequently be exposed to unprotected heights but only occasionally may he climb stairs and ramps, be exposed to extreme cold and heat, high humidity, moving mechanical parts, or operate a motor vehicle. (AR., Doc. 12, pp. 249-50)

In conjunction with his application for DIB, Plaintiff was examined by Dr. William R. Huffman, M.D. on October 5, 2010. Dr. Huffman noted Plaintiff's complaints of chronic back pain and his reports that he has experienced DDD "since 2005" and had neck surgery in 1992. (AR. at p. 201) Further, Plaintiff reported that his back troubles were work related, that he had never received surgery or steroid injections to treat his back pain, and relies solely on ibuprofen for relief. Plaintiff admitted to smoking one and one half packs of cigarettes per day and "has a couple of drinks of alcohol almost every day," but denied using drugs. Dr. Huffman's case notes reveal that he did not review Plaintiff's medical records and his examination was mostly unremarkable. (AR. at p. 201)

Plaintiff experienced "pain on palpation and range of motion in his back," but Dr. Huffman observed that he was in no acute distress and his lower extremity motor strength and reflexes were normal. (AR. at p. 202) Dr. Huffman noted, however, that the range of motion in Plaintiff's dorsolumbar spine was limited. According to Dr. Huffman, Plaintiff's flexion is limited to 80 degrees, extension to 20 degrees, and his right and lateral flexion is limited to 25 degrees. Dr. Huffman identified no other restrictions in Plaintiff's range of motion. Based upon these observations, Dr. Huffman concluded that chronic back pain limits Plaintiff to sitting for 6 to 7 hours per day, walking for 3 to 4 hours per day, and standing for 2 to 3 hours per day. Further, Plaintiff is in incapable of lifting or carrying more than 10 pounds, can only sit for 2 hours at one time, stand for 40 minutes at a time, and walk for 20 minutes at a time. Plaintiff experiences no limitations with his reach, handling, fingering, or feeling but may push or pull only occasionally. (AR., Doc. 12, p. 202)

Dr. Huffman further opined that Plaintiff may never climb ladders or scaffolds but is able to climb stairs and ramps, balance, stoop, kneel, crouch, and crawl occasionally. He may never

be exposed to unprotected heights but may frequently operate a moving vehicle or be exposed to moving parts, high humidity or wetness, dust and other pulmonary irritants, extreme cold and heat, and vibrations. Dr. Huffman found that Plaintiff is unable to walk a block at a reasonable pace on uneven or rough surfaces but can freely perform activities such as shopping, travel without a companion, ambulate without assistance, use public transportation, climb a few steps at a reasonable pace with only one hand rail, prepare his meals and feed himself, care for his personal hygiene, and sort, handle, or use paper and files. (AR. at pp. 206-08)

On November 8, 2010, Dr. Marvin Cohn, M.D., reviewed Plaintiff's medical records, including the examination results and opinions of Dr. Huffman, and concluded that Plaintiff's medically determinable impairments could reasonably be expected to cause Plaintiff's symptoms, but that Plaintiff's reports to Dr. Huffman were inconsistent with the evidence of record and were less than credible. (AR. at p. 220) From his review, Dr. Cohn opined that Dr. Huffman's noted limitations were too restrictive. According to Dr. Cohn, Plaintiff's medical records indicate that he can lift 50 pounds occasionally, 25 pounds frequently, and Plaintiff would be limited to frequent activities in the full range of postural positions as opposed to occasionally.[7] (AR. at p. 218)

Plaintiff testified at the hearing on March 26, 2012 that he had worked at the same chemical plant for 30 years before being fired in May of 2009 for not "staying with the program [his employer] set up for [him] to follow." (AR., Doc. 12, p. 34) After some additional questioning, Plaintiff admitted that he had been fired for testing positive a second time for methamphetamine use. (AR. at p. 34) According to his testimony, Plaintiff has undergone treatment for alcohol abuse and methamphetamine dependency on two separate occasions. (AR.

---

7. The undersigned notes that Dr. Cohn's opinion was confirmed on January 20, 2011, but the confirming opinion is neither signed nor is the physician even identified on the MSS. (AR., Doc. 12, p. 220)

at pp. 34, 43)  Plaintiff underwent treatment for alcohol abuse in 1984 but currently drinks two mixed drinks twice per week.  (AR. at p. 43)  After completing outpatient treatment for methamphetamine dependency in 2007, Plaintiff relapsed in 2009.  (AR. at pp. 35-6)  After losing his job at the chemical plant, Plaintiff testified that he successfully kicked his methamphetamine habit by attending chemical dependency meetings.  (Ar. at p. 35)  Nevertheless, Plaintiff did not seek unemployment benefits or other work to support himself but resided with his girlfriend of 4 years.  (AR. at p. 42)

Plaintiff has been treated by Pat McCarthy since March of 2009 when he injured his back playing golf.  (AR. at pp. 36, 40)  Plaintiff's back pain "comes and goes" and allegedly prevents him from working.  (AR. at pp. 36, 40)  According to his testimony, Plaintiff's back pain is aggravated by simple tasks such as cleaning his feet after walking in the yard, playing in the floor with his grandson, or bending down to raise the toilet seat.  (AR. at p. 36)  The only form of relief Plaintiff utilizes is heat patches, aspirin, and meloxicam.  (AR. at p. 38)  Nevertheless, Plaintiff testified that he can only sit for 30 minutes at a time, stand for 30 minutes at a time, and walk for no more than 10 minutes at one time.  (AR. at p. 40)

On May 23, 2013, the ALJ denied Plaintiff's claim to DIB.  (AR. at pp. 13-21)  As part of the ALJ's ruling, she discounted the opinions of Dr. Couch and Plaintiff's credibility.  According to the ALJ, Dr. Couch's opinion that Plaintiff experienced severe limitations due to DDD was entitled to "no weight [because] he has not seen or treated the claimant in almost three years, and because they are not supported by the medical evidence of record."  (AR., Doc. 12, p. 20)  The ALJ found Plaintiff's complaints of debilitating back pain less than credible due to the lack of medical evidence, his inconsistent statements to his medical providers, and his inconsistent testimony at the hearing.  (AR. at pp. 19-20)

8

## III. ANALYSIS

**A. Standard of Review**

The District Court's review of the Commissioner's denial of DIB is limited to a determination of whether those findings are supported by substantial evidence and whether correct legal standards were applied. 42 U.S.C. § 405(g); *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011). A finding of substantial evidence does not require that all of the evidence in the record preponderate in favor of the determination, but does require more than a mere scintilla to support a denial of DIB. *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007).

The ALJ's determination is entitled to deference where "a reasonable mind might accept [the evidence in the record] as adequate to support" the ALJ's determination even though it could also support a different conclusion. *Rogers*, 486 F.3d at 241; *Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999). "[F]ailure to follow the rules" promulgated to control the process of benefit determination "denotes a lack of substantial evidence, even where the ALJ's" determination is otherwise supportable. *Cole*, 661 F.3d at 937 (*quoting Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399, 407 (6th Cir. 2009))

To substantiate entitlement to DIB, a claimant must demonstrate "a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(a)(1)(E), (d)(1)(A). SSA's procedures require a five-step sequential assessment of whether: 1) a claimant has engaged in substantial gainful activity during the period under consideration; 2) the claimant has a severe medically determinable physical or mental impairment that significantly limits his ability to do basic work activities; 3) the claimant suffers from a severe impairment that meets or equals one of the listings in Appendix I Subpart P of the

regulations and meets the durational requirements; 4) the claimant's impairment prevents him from doing past relevant work; and, if so, 5) is it possible for the claimant to transition to other work. 20 C.F.R. §§ 404.1520(a)(4)(i)-(v), (b)-(g).

**B. Claims of Error**

Plaintiff asserts that the reasons given by the ALJ are "insufficient . . . to not give significant weight to Dr. Couch's opinions" (Plaintiff's Motion for Judgment on the Administrative Record ("M. for Judgment on AR"), Doc. 15, p. 6), and that the ALJ erred in crediting the opinions of non-examining agency physicians over Dr. Couch's. (M. for Judgment on AR, Doc. 15, pp. 8-9) Plaintiff also assigns error to the ALJ's credibility finding in regard to Plaintiff's testimony and other statements made to his health care providers.

**(1)** *The Weight Afforded to the Opinion of Dr. Couch was Sufficient*

Plaintiff argues both that Dr. Couch is a treating source and, thus, his opinion is deserving of "complete deference," and that Dr. Couch's opinion is deserving of "substantial weight." (M. for Judgment on AR, Doc. 15, pp. 6-7) According to Plaintiff, rejecting Dr. Couch's opinion for lack of a recent treatment relationship is fatally inconsistent with affording the opinion of a non-treating and non-examining source significant weight. This is particularly so, according to Plaintiff, in that Dr. Crouch's opinion is generally consistent with that of Dr. Huffman, DDS' own examining expert. Further, Plaintiff argues that "because Dr. Couch's opinions are not actually contradicted by other medical evidence, they must be given complete deference." (M. for Judgment on AR, Doc. 15, p. 6-7)

Under the regulations, a treating source is a claimant's "own physician, psychologist, or other acceptable medical source who provides [the claimant], or has provided [the claimant], with medical treatment or evaluation *and* who has, or has had, an ongoing treatment relationship with [a claimant]." 20 C.F.R, 404.1502. A treating source is not a treating source, however,

10

when a claimant does not seek treatment from that source, but, rather, seeks only the source's opinion in pursuit of DIB. *Id.* As the ALJ noted, Dr. Couch did not have an ongoing treatment relationship with Plaintiff subsequent to May 10, 2007. (AR., Doc. 13, p. 196-98) Plaintiff was not seen or treated by Dr. Couch for his back problems at any time between May of 2007 and January of 2012. Plaintiff only sought an exam by Dr. Couch to complete the medical source statement in support of his claim to DIB. (AR. at pp. 186-98, 246-51)

Further, since Plaintiff was last treated by Dr. Couch in 2007, Patricia McCarthy, a physician's assistant, was Plaintiff's treating source as the record establishes and as Plaintiff testified. (AR., Doc. 12, p. 32) At no time during that period did Dr. Couch or any other physician practicing at FHG co-sign Ms. McCarthy's exam notes. Thus, those record and the observations and treatment evidenced by those records cannot be attributed to Dr. Couch or any other acceptable medical source deserving of "complete deference" as Plaintiff asserts. *See Brock v. Colvin*, No. 2:10-cv-0075, 2013 U.S. Dist. LEXIS 119920 at *10 (M.D. Tenn. Aug. 21, 2013) (noting that co-signature by a physician is required "at a minimum [to show] that the doctor agrees with the nurse practitioner's opinion."). Thus, contrary to Plaintiff's claims, Dr. Couch's opinion is not entitled to complete deference as a treating source.

Also contrary to Plaintiff's claims, there is no requirement that Dr. Couch's opinion be "contradicted by other medical evidence" for the ALJ to discount that opinion. (M. for Judgment on the AR, Doc. 15, p. 7) Rather, the weight afforded to Dr. Couch's opinion is determined by "the relevant evidence [cited] to support [that] opinion, particularly medical signs and laboratory findings." 20 C.F.R. § 404.1527(c)(3). As the ALJ found, Dr. Couch's opinion is not supported by the relevant evidence. While Dr. Couch cites to x-rays and MRI findings in his opinion, those findings, or an expert's impression of those findings, are not in the record. As the ALJ found,

Plaintiff "has [neither] undergone any medication therapy, physical therapy, pain management treatment, or taken any other steps to alleviate his pain and problems," nor sought treatment by an orthopedic specialist, sought pain treatment or other forms of treatment other than aspirin and heat patches for his pain, or even treatment from FHG between May of 2009 and the time Dr. Couch rendered his opinion in 2012 despite the fact that FHG was willing to treat him at a reduced cost. (AR., Doc. 12, pp. 18-20)

The undersigned finds that the ALJ's finding in regard to Dr. Couch's opinion is supported by substantial evidence.

**(2)** *Substantial Evidence Supports the ALJ's Finding in Regard to Plaintiff's Credibility*

Plaintiff asserts that the ALJ failed to properly assess his credibility. Plaintiff argues that the ALJ "[h]arped on a few alleged inconsistencies to reduce the claimant's credibility." (M. for Judgment on AR, Doc. 15, p. 11) According to Plaintiff, the ALJ "cherry picked" the record to focus on the fact that Plaintiff claimed he was fired for "not following the rules" when he was in fact fired for drug use and that he told Dr. Huffman that he was homeless when he in fact resided with his girlfriend. (M. for Judgment on AR, Doc. 15, p. 11) Contrary to Plaintiff's claims, however, the ALJ's consideration of Plaintiff's credibility was far reaching and comprehensive as the regulations require.

Once the ALJ finds an "underlying medically determinable physical impairment that could reasonably be expected to produce the claimant's symptoms," she must make a finding in regard to a claimant's credibility where his subjective complaints are not supported by objective medical evidence of record. *Rogers*, 486 F.3d at 247. The record as a whole frames the ALJ's consideration of

> the claimant's daily activities; the location, duration, frequency, and intensity of symptoms; factors that precipitate and aggravate symptoms; the type, dosage,

effectiveness, and side effects of any medication taken to alleviate the symptoms; other treatment undertaken to relieve symptoms; other measures taken to relieve symptoms, such as lying on one's back; and any other factors bearing on the limitations of the claimant to perform basic functions.

*Id.* (quoting Soc. Sec. Rul. 96-7p, 1996 WL 374186, at *2-3 (July 2, 1996)).

As noted *supra* at p. 12, the ALJ discussed at length Plaintiff's failure to seek treatments or alternatives to control his back pain. In regard to Plaintiff's activities of daily living, the ALJ noted Plaintiff's ability to care for his daily needs, go outside multiple times each day, ride a motorcycle, and shop. (AR., Doc. 13, p. 19) Moreover, the ALJ gave consideration to many of the inconsistencies in Plaintiff's testimony and statements made to medical professionals. In addition to mischaracterizing the conditions of his termination from the chemical plant and his living situation, Plaintiff complained to Dr. Huffman that the pain in his back was consistent when he admitted at the hearing and to the State Agency experts that his pain was intermittent. Plaintiff told Dr. Couch that his injuries were caused by picking up his grandchild, told Dr. Huffman it was work related, and testified that it stemmed from playing golf.

Further, the extent of Plaintiff's misstatements about his drug use is considerably more extensive than Plaintiff acknowledges here. According to the record, Plaintiff denied use of illicit drugs to Dr. Huffman and the Agency's psychological examiner, but the record reveals that Plaintiff has been received alcohol and drug dependency treatment at least twice and was ultimately fired from his job for methamphetamine use. Plaintiff reported to the Agency's psychological examiner and to Dr. Huffman that he "has a couple of drinks of alcohol almost every day" (AR., Doc. 12, pp. 201, 223), but testified that he only drinks twice a week. (AR. at p. 43)

The Magistrate Judge finds the ALJ's credibility assessment of Plaintiff to be in accord with the regulations and supported by substantial evidence.

## IV.  CONCLUSION

For the foregoing reasons, the Magistrate Judge finds that the ALJ's determination to be supported by substantial evidence.

## V.  RECOMMENDATION

For the reasons stated above, the undersigned recommends that the plaintiff's motion for judgment on the record (Doc. 14.) be **DENIED** and the ruling of the ALJ be **AFFIRMED**.

The parties have fourteen (14) days of being served with a copy of this R&R to serve and file written objections to the findings and recommendation proposed herein. A party shall respond to the objecting party's objections to this R&R within fourteen (14) days after being served with a copy thereof. Failure to file specific objections within fourteen (14) days of receipt of this R&R may constitute a waiver of further appeal. *Thomas v. Arn*, 474 U.S. 140, *reh'g denied*, 474 U.S. 111 (1986); *Cowherd v. Million*, 380 F.3d 909, 912 (6th Cir. 2004).

**ENTERED** this 15th day of July, 2014.

/s/Joe B. Brown
Joe B. Brown
Magistrate Judge